# IN THE ST. LOUIS COUNTY CIRCUIT COURT
# STATE OF MISSOURI

|  |  |
|---|---|
| **PETER FISCHER,** *individually and on behalf of all others similarly situated,*  Plaintiffs,  v.  **CONOPCO, INC.,** *d/b/a* **"UNILEVER,"** **DOES 1 through 10,**  Defendants. | Case No. _____  **JURY TRIAL DEMANDED** |

## CLASS ACTION PETITION

Plaintiff Peter Fischer, individually and on behalf of all others similarly situated, hereby files this, his Class Action Petition, against Defendant Conopco, Inc., *d/b/a* "Unilever" and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting, on a nationwide basis, breach of warranty, breach of implied contract, and unjust enrichment, and, in the state of Missouri, violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

### I.   INTRODUCTION

1. Defendant Unilever markets and sells many different consumer products, including deodorant and antiperspirant sticks. One such product is "Dove"-branded "Men + Care" "DrySpray" antiperspirant spray featuring so-called "Stain Defense."

2. The "Stain Defense" line of products is deceptively and misleadingly marketed as being "anti yellow stains" and "anti white marks," and having a formula that prevents white marks and staining.

3. However, despite those claims, the "Stain Defense" line of antiperspirant spray actually

1

*causes* and *creates* the "yellow stains" and "white marks" that it claims to "prevent" or be "anti-" towards.

4.  Not only is that fact obvious and apparent from using the product, but it is a scientific fact that "white marks" and "yellow stains" are *caused by* and *created by* the product's primary active ingredient, Aluminum Chlorohydrate ("Aluminum").

5.  Notably, because it is scientifically well-established that aluminum in some antiperspirant sprays causes white marks and staining, there are numerous other brands of deodorant spray on the market that do not contain aluminum and therefore can *legitimately* claim to be "anti-white marks" and/or "anti-yellow marks" and/or to "prevent" white marks or staining. The "Stain Defense" antiperspirant spray, despite posing as such, is no such product. The product does absolutely nothing to decrease, lessen or reduce stains or white marks – it creates them.

6.  The fact that *legitimate* anti-stain and anti-white-mark deodorant sprays exist on the market renders Unilever's deception all the more convincing to consumers; a consumer does not simply take for granted that all deodorant sprays cause white marks and stains. Rather a consumer has reason to believe that the "Stain Defense" antiperspirant spray categorically *does not cause* white marks or yellow stains, *not* that it simply does so to a lesser extent than "normal" antiperspirant or deodorant sprays.

7.  Yet, in reality, the "Stain Defense" line of antiperspirant sprays actually *causes* the very problems Unilever deceptively claim it is "anti" towards and/or prevents. Even if the product actually causes/results in "fewer" white marks and stains than other brands or other products (which is not apparent), the fact it causes or results in such white marks and stains ***at all*** makes its claims false and misleading.

8.  Importantly, nowhere on the product are there any indications that the product is "anti yellow stains," "anti white marks," and/or having a "Stain Defense" quality *in comparison to "regular" deodorant or antiperspirant brands.* Rather, the product simply and unqualifiedly claims to be "anti-"

2

toward and/or to "defend against" problems and conditions it, in reality, causes.

9. In short, while "Stain Defense" antiperspirant spray is deceptively marketed as being "anti" towards and preventing white marks and stains, it causes the very problems it claims to solve, demonstrably creating and causing both white marks and yellow stains on a variety of clothing.

10. Despite all this, Unilever sells the product to the buying public, misleading and deceiving consumers into paying for an inferior product while under the false impression that it has benefits that it does not contain.

11. Pursuant to the MMPA, such practice is illegal.

12. In addition and/or in the alternative to the above, since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product is "Anti Yellow Stains" and/or "Anti White Marks." Those uniformly-worded false statements give rise to additional and/or alternative claims on behalf of a nationwide class of similarly-situated consumers.

## II.   PARTIES, JURISDICTION, AND VENUE

13. Plaintiff Peter Fischer is a citizen and resident of St. Louis City, Missouri.

14. Plaintiff brings this Class Action Petition individually and on behalf of a putative nationwide class of all United States consumers and, additionally or alternatively, a putative class of Missouri residents.

15. Defendant Conopco, Inc. *d/b/a* "Unilever" (hereinafter "Unilever") is a New York corporation having its principal place of business at 700 Sylvan Ave., Englewood Cliffs, NJ 07632. Unilever may be served at: CT Corporation System, 120 South Central Ave., Clayton MO 63105.

16. Defendant Unilever advertises, distributes, markets and sells the "Dove"-branded "Men + Care" "DrySpray" antiperspirant spray featuring so-called "Stain Defense."

17. The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names.

Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

18. Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

19. This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA. Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable. This action raises questions of law and fact common among Plaintiffs. The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

20. <u>Class and Subclass definitions</u>: Plaintiff Peter Fischer brings this action on behalf of himself and a nationwide class of similarly-situated persons preliminarily-[1] defined as follows: All persons who purchased "Dove"-branded "Men + Care" "DrySpray" antiperspirant spray featuring so-called "Stain Defense" (the "Product")[2] during the Class Period in the United States. In addition, and/or alternatively, Plaintiff Peter Fischer brings this action on behalf of herself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Product in the State of Missouri. The Class Period begins five years prior to the date of the filing of the this Petition, and ceases upon the date of the filing of this Petition. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers

---

[1] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.
[2] As that term and label is defined in greater detail *infra.*

4

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

21. <u>Numerosity</u>: Upon information and belief, the Class and Subclass includes tens of thousands, if not hundreds of thousands, of individuals on a statewide basis, making their individual joinder impracticable. Although the exact number of Class and Subclass members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

22. <u>Typicality</u>: Plaintiff's claims are typical of those of the Class and Subclass because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Product to Plaintiffs.

23. <u>Adequacy</u>: Plaintiff Peter Fischer is an adequate representative of the Class and/or Subclass because his interests do not conflict with the interests of the Class or Subclass members he seeks to represent, he has retained competent and experienced counsel, and he intends to prosecute this action vigorously. The interests of the Class and Subclass will be protected fairly and adequately by Plaintiff and his counsel.

24. <u>Commonality</u>: Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Product; (b) whether and to what extent the Class and Subclass members were injured by Defendant's illegal conduct; (c) whether the Class and Subclass members are entitled to compensatory damages; (d)

whether the Class and Subclass members are entitled to punitive damages; (e) whether the Class and Subclass members are entitled to declaratory relief; and (f) whether the Class and Subclass members are entitled to injunctive relief.

25. <u>Superiority</u>: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by the individual Class and Subclass members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct. Thus, it would be extremely difficult for the individual Class and Subclass members to obtain effective relief. A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

### III.   BACKGROUND

26. Defendant manufactures, distributes, and/or sells the product at issue herein, "Dove"-branded "Men + Care" "DrySpray" antiperspirant spray featuring so-called "Stain Defense."

27. Defendant Unilever, in particular, owns the "Dove" brand and, under that brand name, manufactures and distributes, *inter alia,* the "Men + Care" "DrySpray" antiperspirant spray featuring so-called "Stain Defense."

28. The "Stain Defense" line of products is marketed as purportedly protecting and/or preventing or being "anti" against "yellow stains" and "white marks" on clothing worn by a user of the Product.

29. The packaging of the Product makes at least two such claims:

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

 

a.

30. As shown, the "Stain Defense" line of antiperspirant spray is marketed as being "Anti-Yellow Stains," and being "Anti White Marks."

31. However, the active ingredient in the Product is Aluminum Chlorohydrate. It has long been recognized, and is well-accepted, that "yellow stains" and "white marks" on clothing is *caused,* both directly and indirectly, by aluminum in some antiperspirants.

32. It is irrefutable that the Product will inevitably lead and contribute to more staining and white marks on clothing than when it is not used at all.

33. Thus, regardless of the extent, the Product causes, at least indirectly, the exact condition – "staining" and/or "white marks" – that it purports to be "anti"- towards.

34. Importantly, nowhere on the product are there any indications that the product is "anti yellow stains," "anti white marks," and/or having a "Stain Defense" quality *in comparison to "regular" deodorant or antiperspirant brands.* Rather, the product simply and unqualifiedly claims to be "anti-" toward and/or to "defend against" problems and conditions it, in reality, causes.

35. Moreover, on retail websites selling the Product, according to Defendant itself, the

Product includes "anti-stain and anti-mark protection."[3]

36. However, these statements are patently deceptive and misleading because the Product has no such affirmative "protection." The product does absolutely nothing to decrease, lessen or reduce stains or white marks – it creates them.

37. Moreover, adding yet another layer of deception to Defendant's marketing and selling of the Product, compared to the non-"Stain Defense" "Men + Care" antiperspirant spray, the Product has the exact same ingredients, with nothing "added."

38. According to Unilever's Dove-branded website, www.Dove.com, and confirmed by corresponding product packaging, both the Product and the non-"Stain Defense" "Dove + Care" line of antiperspirant sprays contain the following ingredients:

   a. Active Ingredient: Aluminum Chlorohydrate

   b. Inactive Ingredients: Butane, Hydrofluorocarbon 152a, Cyclopentasiloxane, Isobutane, PPG-14 butyl ether, Fragrance (Parfum), Helianthus annuus (sunflower) seed oil, disteardimonium hectorite, C12-15 Alykyl benzoate, Propane, BHT, Octyldodecanol, Propylene carbonate, Dimethiconol, Tocopheryl acetate.

39. In short, the Product is the *exact same formula* as is Dove's non-"Stain Guard" men's antiperspirant spray.

40. Upon information and belief, and based on a reasonable person's common understanding, Defendant's simply re-packing the exact same formula does not constitute the addition of "protection" against white marks and yellow stains.

41. Indeed, even the concentration of the Product's active ingredient, Aluminum

---

[3] https://www.walgreens.com/store/c/dove-men%2bcare-dry-spray-antiperspirant-deodorant-stain-defense-cool/ID=prod6372707-product, citing "Unilever" as source for claims.

Chlorohydrate, is uniform between the Product and the non-"Stain Guard" "dryspray," being 20.2% in each.

42. And that deceptive fact is *in addition to* the worse reality that the Product causes what it falsely claims to "protect" against and/or be "anti" towards.

43. Notably, because it is scientifically well-established that aluminum in some antiperspirant sprays causes white marks and staining, there are numerous other brands of deodorant spray on the market that do not contain aluminum and therefore can *legitimately* claim to be "anti-white marks" and/or "anti-yellow marks" and/or to "prevent" white marks or staining. The "Stain Defense" antiperspirant spray, despite posing as such, is no such product.

44. The fact that *legitimate* anti-stain and anti-white-mark deodorant sprays exist on the market renders Unilever's deception all the more convincing to consumers; a consumer does not simply take for granted that all deodorant sprays cause white marks and stains. Rather a consumer has reason to believe that the "Stain Defense" antiperspirant spray categorically *does not cause* white marks or yellow stains, *not* that it simply does so to a lesser extent than "normal" antiperspirant or deodorant sprays.

45. Merriam- Webster online dictionary defines the word "anti" as meaning, *inter alia,* "serving to prevent, cure, or alleviate" or "combating or defending against;"[4] the Product, containing ingredients that *cause* staining and white marks (even if to a lesser extent than other products), is unquestionably *not* fairly or honestly characterized as "anti-yellow stains" or anti-white marks."

46. A normal consumer is unable to determine simply by reading the claims on the Product packaging and/or the Product's ingredient list that it actually contains no "added" ingredients relative to Defendant's non-"stain defense" line of antiperspirant sprays.

47. While the fact is extremely well-established, a normal consumer also is unaware that

---

[4] https://www.merriam-webster.com/dictionary/anti

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

Aluminum Chlorohydrate is a key factor (along with a person's perspiration) that contributes to and, at least indirectly, *causes* the "yellow stains" and "white marks" the Product purports to "protect" against and/or be "anti" toward.

48. Moreover, while the Product very obviously leaves "white marks" on clothing, a potential purchaser is unable to test that fact prior to purchasing the Product.

49. Upon information and belief, Defendant Unilever profits from the wide-spread practice of selling a re-packaged version of its regular product carrying numerous claimed "additional" benefits.

50. Upon information and belief, Defendant Unilever deceptively and misleadingly markets the Product as falsely having an "added benefit" to hide the fact from consumers that the Product is, in fact, nothing more than the same product as is the non-"Stain Defense" antiperspirant spray, having no "anti" mark or stain benefits.

51. Defendant's marketing and selling of the Product by use of the aforementioned false, deceptive, and misleading statements is illegal and prohibited under the MMPA.

*Allegations Relating Specifically to Claims of the Nationwide Class*

52. As noted, *supra,* since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product is "Anti White Marks" and "Anti Yellow Stains" (hereinafter "False Claims").

53. In reality, testing and usage of the Product reveals the falsity of the False Claims; not only does the Product readily leave white marks on multiple colors of clothing, when transferred to clothing from a user's body and mixed with perspiration, over time, the Product also creates yellow stains on clothing. The product does absolutely nothing to decrease, lessen or reduce stains or white marks – it creates them.

54. Defendant, as developer, manufacturer, and exclusive seller and distributor of the Product, has been aware since the Product's inception, that the False Claims are in fact false – that the

10

Product leaves white marks and causes yellow stains.

55. Indeed, Defendant undoubtedly did its own testing of the Product prior to it being offered for sale and, of necessity, such testing would have made Defendant aware that the Product leaves white marks on clothing and causes yellow staining.

56. Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that caused no white marks or yellow stains on their clothing and instead was "anti white marks" and "anti yellow stains."

57. Importantly, nowhere on the product are there any indications that the product is "anti yellow stains," "anti white marks," and/or having a "Stain Defense" quality *in comparison to "regular" deodorant or antiperspirant brands.* Rather, the product simply and unqualifiedly claims to be "anti-" toward and/or to "defend against" problems and conditions it, in reality, causes.

58. Plaintiff and the class members purchased the Product with no reason to suspect or know that the Product actually caused white marks and yellow stains.

59. Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product and whether the Product would, in fact, cause yellow staining when combined with a user's perspiration.

60. In fact, in regard to the aspect of the False Claims relating to yellow staining, the Product is a credence good because its purported "anti yellow stains" benefit cannot be independently assessed or verified by the consumer at the time of purchase.

61. In purchasing the Product, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

62. Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Product.

63. As the direct and proximate result of the False Claims, Plaintiff and the class members

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

64. By marketing, selling and distributing the Product to purchasers in Missouri and throughout the United States, Defendant made actionable statements that the Product was "Anti White Marks" and "Anti Yellow Stains," and at all times failed to disclose that the Product did in fact cause and/or contribute to white marks and yellow stains.

65. Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

66. Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

67. As the distributor, marketer, producer, manufacturer, and seller of the Product, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product which the Plaintiff and the class members could not and did not review.

68. All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

69. Further, Plaintiffs' claims arise, *inter alia,* from "front of the box" statements and symbols which are not regulated by the Nutrition Labeling and Education Act.

*Facts Particular to Peter Fischer and Representative of the Proposed Class and Subclass*

70. In or around January of 2021, Plaintiff purchased the Product from a third-party retailer while in Missouri.

71. Due to the claims on the packaging, Plaintiff falsely believed he was purchasing a product that would "protect" against and/or be "anti" toward, as opposed to cause, "white marks" and

12

"yellow stains."

72. Plaintiff thereafter purchased the Product. He purchased the Product primarily for his personal, family and household use.

73. At the time he purchased the Product, Plaintiff was unaware of the falsity of the Product's claims and/or the falsity of Defendant's online claims regarding the Product.

74. He discovered that such claims were false shortly after purchasing the Product, seeing that it created, *inter alia,* white marks on his clothing.

75. If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product.

76. When Plaintiff purchased the Product, he was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

77. Specifically, Plaintiff suffered an ascertainable loss because he did not receive the expected benefit of his bargain.

78. When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that he was receiving a product that was "anti" towards white marks and yellow stains and/or did something to decrease, lessen and/or reduce stains and/or white marks. The Product did not do what Plaintiff bargained for; rather, the Product *created* white marks and yellow stains.

79. Especially in light of the fact that non-aluminum containing antiperspirant and deodorant products exist on the market, products that *legitimately* reduce or eliminate white marks and yellow stains, Plaintiff specifically did *not* bargain for a Product that merely created and/or resulted in "fewer" or "reduced" white marks and stains compared to more heavily-staining or marking products; Plaintiff expected to receive a Product that did **not** *cause* and *create* white marks and stains.

80. The Product was not at all what it was purported to be. Plaintiff did not receive the value of what he bargained for; instead Plaintiff received a product that unremarkably caused white marks and

13

yellow stains on his clothing.

81. Consequently, Plaintiff was damaged in the amount of the difference between the value of the Product as represented – as one that was "anti" white marks and yellow stains (such value is approximately what Plaintiff paid), and the actual value of the product as received – because Plaintiff did not want a product that *caused* white marks and yellow stains on his clothing, the actual value to Plaintiff was nothing.  Thus, Plaintiff was damaged in the full amount paid for the Product.

82. Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class and Subclass, all that is relevant is that Plaintiff and the class members, United States and Missouri citizens, purchased the Product at a time within the Class Period while in the United States and/or Missouri.

## CAUSES OF ACTION

## COUNTS RELATING TO THE NATIONWIDE CLASS

### COUNT ONE: BREACH OF WARRANTY

83. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition.

84. Defendant sold the Product in its regular course of business.  Plaintiff and the class members purchased the Product.

85. Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims -- that the Product was "anti yellow stains" and "anti white marks."

86. The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

87. Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

88. Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each

14

a written warranty.

89. Defendant breached the warranty because the False Claims were false – the Product in fact causes white marks and yellow stains.

90. The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

91. All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.

92. Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

93. Specifically, on February 20, 2021, and again on February 22, 2021, counsel for Plaintiff provided written NOTICE of Defendant's breach of express warranty to Defendant directly and to Defendant's legal counsel. Despite receiving such correspondence, Defendant has not meaningfully responded, and has taken no action to remedy its breach of express and implied warranty.

94. In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia,* Defendant's testing and use of the Product.

95. Defendant has nonetheless refused to remedy such breaches.

96. By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

97. Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid. As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages, including

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

economic damages in terms of the difference between the value of the product as promised and the value of the product as delivered.

98. As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

**COUNT TWO: BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)**

99. Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

100. By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

101. By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

102. By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

103. As a result of that breach, Plaintiff and each class member suffered damages.

**COUNT THREE: UNJUST ENRICHMENT**

104. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

105. Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

106. Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

107. Defendant either knew or should have known that the payments rendered by Plaintiff and

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

the class members were given and received with the expectation that the Product would be as represented and warranted. For Defendant to retain the benefit of the payments under these circumstances is inequitable.

108. Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

109. Equity demands disgorgement of Defendant's ill-gotten gains. Defendant will be unjustly enriched unless Defendant is ordered to disgorge those profits for the benefit of Plaintiff and the class members.

110. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNTS RELATING TO THE MISSOURI SUBCLASS

**COUNT FOUR: VIOLATION OF THE MMPA – Misleading, False, and Deceptive Marketing**

111. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition, as though fully set forth herein.

112. Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

113. Plaintiff and all members of the Class are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

114. As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat.

17

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

chap. 407 ("MMPA"), in particular, Defendant marketed the Product by falsely claiming it "protects" against, and/or is "anti" to, conditions that it, in reality, contributes to and/or causes.

115. As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing "protected" against or was "anti" towards conditions it actually contributes to and indirectly and directly causes.

116. Defendant's deceptive acts caused Plaintiff and the Class Members an ascertainable loss within the meaning of the MMPA. In particular, Plaintiff and the class paid for a Product that did not, in fact, "protect" against the conditions Defendant purports it did; the Product was *not* "anti" yellow stains or white marks. The Product instead *created and caused* those conditions.

117. Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

118. In addition, Defendant's conduct as aforesaid was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiffs and others similarly situated and, therefore, warrants the imposition of punitive damages.

119. Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order certifying this action as a Nationwide class action, along with a Missouri subclass, and appointing Plaintiff Peter Fischer as Class and Subclass representative and his counsel as class counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned nationwide claims; and/or violated the MMPA, and award Plaintiffs compensatory damages, restitution, attorneys' fees, punitive damages, costs, and such further relief as the Court deems just, including injunctive relief.

Electronically Filed - St Louis County - March 08, 2021 - 04:00 PM

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*